FILED
11-27-2017
John Barrett
Clerk of Circuit Court
2016CF000762

1    STATE OF WISCONSIN          CIRCUIT COURT          MILWAUKEE COUNTY

2    _____

3    STATE OF WISCONSIN,

4                              Plaintiff,

5                                          Case No. 2016-CF-000762
          vs.
6    MARVIN L. CARTER,

7                              Defendant.

8    _____

9                    TRANSCRIPT OF PROCEEDINGS

10   _____

11   Proceedings:          Motion Hearing

12   Date:                 August 9, 2016

13   Before:               THE HONORABLE TIMOTHY WITKOWIAK
14                         Branch 22

15                         APPEARANCES:

16
     For the Plaintiff:          LAURA A. CRIVELLO
17                               Assistant District Attorney

18   For the Defendant,          MARK SCHOENFELDT
     who appeared in person:     Attorney at Law
19

20

21

22

23

24
     Reported by:     Lisa A. Weninger, Certified Court Reporter
25                    (414) 278-4506

                                                                    1

**INDEX**

| **Witness:** | **Page** |
|---|---|

JOHN KUSPA

Direct examination by Attorney Crivello     10

Cross-examination by Attorney Schoenfeldt     25

Redirect examination by Attorney Crivello     30

Recross-examination by Attorney Schoenfeldt     30

**EXHIBITS**

| **No.** | **Description** | **Page** | **Recv'd** |
|---|---|---|---|
| 1 | Photo of front of residence with front door | 20 | 22 |
| 2 | Photo of front door leading from the exterior to the interior | 21 | 22 |
| 3 | Photo of hallway | 21 | 22 |
| 4 | Photo half-way up facing upward toward unit upstairs | 22 | 22 |

```
 1                  P R O C E E D I N G S
 2                  THE CLERK:  State of Wisconsin versus
 3       Marvin Carter.  16-CF-762.  Appearances.
 4                  MS. CRIVELLO:  Laura Crivello appearing on
 5       behalf of the State.
 6                  MR. SCHOENFELDT:  Good afternoon, Your
 7       Honor.  Attorney Mark Schoenfeldt on behalf of Marvin
 8       Carter, who appears in person.
 9                  THE COURT:  All right.  My understanding
10       is the matter is set for motion hearing today.  Are
11       both sides prepared to proceed?
12                  MS. CRIVELLO:  Yes, Your Honor.
13                  MR. SCHOENFELDT:  Yes.
14                  THE COURT:  The State's first witness.
15                  MS. CRIVELLO:  Your Honor, I think it
16       makes more sense that the defendant start the second
17       prong of his argument.  The second prong is alleging
18       that the affidavit underlying the search warrant does
19       not contain probable cause.
20                  Relative to that matter, it doesn't
21       require any testimony to be heard.  It's just a basic
22       reading of the warrant and a determination as to
23       whether or not The Court finds that there was probable
24       cause underlying the search warrant.  Is that correct,
25       defense counsel?
```

```
 1                    MR. SCHOENFELDT:  I guess that would make
 2         sense, yes.
 3                    THE COURT:  Does anybody have the
 4         affidavit?
 5                    MR. SCHOENFELDT:  I do.
 6                    THE COURT:  Thank you.  So we've got five
 7         controlled buys alleged.  There's indication within
 8         the last 72 hours the confidential informant did make
 9         a purchase at the address.  The officers observed the
10         purchase.  The officers did a test and found it be to
11         be heroin or found it be to be opiates, I should say.
12                    So, Counsel, why do you think this does
13         not give you sufficient information to -- for the
14         issuance of a warrant?
15                    MR. SCHOENFELDT:  Well, Your Honor, it's
16         contained pretty much in my brief.  I've summarized
17         what my argument is in this case.  If I just look at
18         the State's brief actually in this case, we can see
19         that there are some issues or elements missing in the
20         probable cause portion -- probable cause portion of
21         the affidavit.
22                    I'm turning to the State's brief.  First
23         of all, the case law that makes up probable cause, and
24         that would be on page six of eight -- whether a search
25         warrant is supported by probable cause is determined
```

4

Exhibit 1019 - 004

1      by the totality of the circumstances.

2                    Okay.  This requires a probable cause,

3      common sense test, and person supplying hearsay

4      information that there be a fair probability that

5      contraband or evidence of a crime will be found in a

6      particular place.

7                    So we're looking at the totality of the

8      circumstances.  We turn to page seven of the State's

9      brief and we have the --

10                   THE COURT:  Let's look at the affidavit.

11     The officers set up a buy at this residence 72 hours

12     before, observed the -- searched the confidential

13     informant.  There's no drugs, and then get the --

14                   MR. SCHOENFELDT:  Stop there, Your Honor.

15     I'm sorry, I don't want to interrupt.

16                   THE COURT:  Go ahead.

17                   MR. SCHOENFELDT:  I don't want to

18     interrupt you, but that's the crux of the problem

19     here.

20                   THE COURT:  I see.  So there was no

21     indication of a search?

22                   MR. SCHOENFELDT:  We're looking at the

23     totality of the circumstances.  Number one is fine.

24     Number two, that within the preceding 72 hours of

25     obtaining the search warrant, the informant was

```
1        searched for contraband.  So what.

2                    He was searched 72 hours before obtaining

3        this search warrant.  The affidavit here that was

4        drawn up by Detective Kuspa, it is very particular

5        when the quote/unquote controlled buy was finished,

6        because he states in his affidavit that the

7        confidential informant was in fact searched after the

8        controlled buy.

9                    Nowhere in this affidavit does it state

10       that this confidential informant was searched

11       immediately, and the important word here to remember

12       is immediately before this quote/unquote controlled

13       buy took place.

14                   The controlled buy is -- it's warrant 101.

15       In order to obtain a warrant in a case like this, you

16       have to have a controlled buy.  A controlled buy is

17       really a three-step process.

18                   There's a search of the confidential

19       informant, there's the buy, and then there's the

20       search of the confidential informant.  Nowhere in the

21       affidavit, and it's nowhere in the State's brief, and

22       it doesn't mention it really, it says that we've

23       argued something else, which it's way off on another

24       tangent.

25                   We're not even arguing that.  We're
```

6

1    arguing the fact that based on the affidavit that was
2    presented to the magistrate in this case, the court
3    commissioner, the court commissioner could not
4    possibly have found probable cause, because if we're
5    going to follow through with a controlled buy, let's
6    do it right.
7         We don't have the date, we don't have the
8    time, we don't have the fact that this confidential
9    informant was searched before he went in to do this
10   buy.  It's a buy, and he might have brought back
11   heroin, but we don't know that this confidential
12   informant had that in his pocket before he executed
13   his controlled buy.
14        THE COURT:  Counsel --
15        MR. SCHOENFELDT:  Based on --
16        THE COURT:  -- paragraph 13 indicates the
17   search, paragraph 14 indicates the buy.  It follows.
18   If it was disjunctive, I would agree with you, then
19   perhaps we'd have a problem, but it appears to me that
20   it follows that the buy occurred right after the
21   search.
22        MS. CRIVELLO:  I would also reference that
23   there's this great paragraph in paragraph five, that
24   defines exactly what a controlled buy is.  It's a term
25   which refers to a situation in which a confidential

```
 1        informant works with law enforcement officers

 2        regarding the purchase of a controlled substance.

 3              This paragraph goes on to indicate what a

 4        controlled buy is, and it says, the affiant searches

 5        the person in clothing of the informant to make sure

 6        the informant has no controlled substance or moneys on

 7        his person.  The affiant then givens the informant

 8        money and watches the informant proceed to the

 9        targeted location.

10              The affiant then watches the informant

11        depart from the targeted location a short time later

12        and return to the affiant.  The informant gives

13        affiant the controlled substance, which the informant

14        has purchased at the targeted location, which is

15        exactly what is set forth in the paragraphs that are

16        in order starting at paragraph 13 going on to 14,

17        going on to 15, and ultimately resulting in the

18        testing that's reflected in paragraph 16.

19              MR. SCHOENFELDT:  That's simply not true.

20        He was not -- it does not state in the affidavit that

21        he was searched prior to this buy taking place.

22              MS. CRIVELLO:  It reflects the

23        defendant -- the confidential informant was subjected

24        to a search, that this search occurred 72 hours; that

25        following that he was given a hundred dollars in
```

Exhibit 5010 - 008

1    prerecorded U.S. currency.  That the affiant did
2    follow the confidential informant to the targeted
3    premises.

4              THE COURT:  Counsel, I don't need a third
5    and second timeline for the officers.  This clearly
6    indicates this is one transaction.  If it appeared
7    again disjunctive, then I wouldn't disagree with you
8    necessarily, but here it flows, it's exactly step by
9    step what occurred.

10             I mean, if there were any indication that
11   there was a separate timeline, then perhaps I would
12   agree with you, that it's disjunctive, but here it
13   shows that there was a search done.  Then the very
14   next paragraph indicates they followed him to this
15   address, they arrived at the address, and the buy was
16   made.  So I don't --

17             MR. SCHOENFELDT:  Without any time
18   reference whatsoever in this affidavit.  When this buy
19   took place, what time of day this -- without any
20   particularity of what time it took place, just
21   simply -- that he was searched 72 hours before a buy
22   took place.

23             MS. CRIVELLO:  Actually it doesn't say
24   that.  It says it was 72 hours before the warrant was
25   obtained.  So within the 72 hours --

9

Exhibit 5019 - 009

```
 1                    THE COURT:  Right.

 2                    MR. SCHOENFELDT:  Before the warrant was

 3        obtained, yes.

 4                    THE COURT:  The Court's going to deny that

 5        portion of the defense motion.

 6                    MS. CRIVELLO:  Thank you.  Turning to the

 7        next portion, if defense counsel seeks to go forward

 8        -- I'll call my witness.

 9                    MR. SCHOENFELDT:  Let me have a minute.

10                    THE COURT:  Sure.  Why don't you hit the

11        microphone, Counsel.

12                    (Discussion off the record.)

13                    MS. CRIVELLO:  The State would call

14        Detective John Kuspa.

15                    THE CLERK:  Please raise your right hand.

16                    (JOHN KUSPA, WITNESS, DULY SWORN.)

17                    THE CLERK:  Please state your name and

18        spell it for the record.

19                    THE WITNESS:  Detective John, J-O-H-N,

20        last name is Kuspa, K-U-S-P, as in Paul, A.

21                    MS. CRIVELLO:  May I proceed?

22                    THE COURT:  Sure.

23                         DIRECT EXAMINATION

24   BY MS. CRIVELLO:

25   Q    Thank you.  Detective Kuspa, by whom are you employed?
```

Case 2:16-cv-01430-JPS   Filed 06/28/23   Page 10 of 41   Document 125-17
Exhibit 4019 - 010

```
1    A    I'm a detective with the Milwaukee Police Department.

2    Q    How long have you been a detective?

3    A    11 and-a-half years.

4    Q    How long have you been a police officer?

5    A    25.

6    Q    Where are you presently assigned?

7    A    Working out of the High Intensity Drug Trafficking

8         Area assigned to the Milwaukee Metropolitan Drug

9         Enforcement Group.

10   Q    How long have you been so assigned?

11   A    I've been at HIDTA since 2010.

12   Q    And what are the basic nature of your duties?

13   A    Narcotics investigations within the county of

14        Milwaukee.

15   Q    And on -- in November of 2016 were you so involved?

16   A    Yes.

17   Q    And in fact, based on information that you had gained,

18        were you the affiant for a search warrant?

19   A    Yes.

20   Q    And was that search warrant for ████████████

21        ██████ ?

22   A    Correct.

23   Q    And that's in the city and county of Milwaukee, state

24        of Wisconsin?

25   A    Yes.
```

11

```
1   Q    And who was the target of that warrant?

2   A    Mr. Marvin Carter.

3   Q    Do you see him present in court?

4   A    I do.

5   Q    Please identify him by where he's seated and what he's

6        wearing.

7   A    He's the African-American male wearing a pink jumpsuit

8        sitting at the defense table.

9              MS. CRIVELLO:  May the record reflect that

10       Detective Kuspa identified the defendant.

11             THE COURT:  The record will so reflect.

12             MS. CRIVELLO:  Thank you.

13  Q    And on February 12th of 2016 were you present at █████

14       ███████████████████ ?

15  A    Correct.

16  Q    And you were the lead officer of this investigation;

17       is that correct?

18  A    Correct.

19  Q    But on top of that, you were the team leader of the

20       entry team; is that correct?

21  A    Correct.

22  Q    What training do you have to be a team leader?

23  A    We do executions of search warrants.  We have a group

24       of individuals that are trained.  It's not a swat team

25       but we've gone through formal training.  We have the
```

```
 1          equipment to execute the warrants.

 2                    My job as team leader is basically to

 3          coordinate the team that will actually be executing

 4          the search warrant.

 5   Q      What does that mean to coordinate the team?

 6   A      Arrange the members that will be present to actually

 7          execute the warrant on a given day.

 8   Q      And do you actually do the briefing about where you're

 9          making entry, how to make entry, who's going to be the

10          lead person making entry?

11   A      Correct.  That's usually the day of the warrant.  It

12          also involves doing a recognizance on a particular

13          residence to determine best safe route to the

14          residence, the approach to the residence, and actually

15          the actual briefing and designating assignments to

16          each member involved.

17   Q      And how many years have you been a team leader of this

18          entry team?

19   A      Probably the last four.

20   Q      Okay.  So on this date you arrive at this targeted

21          location with the entry team; is that correct?

22   A      On the day of the warrant --

23   Q      Correct.

24   A      -- service, yes.

25   Q      And about how many people are comprised of this unit?
```

13

Exhibit 4019 - 013

1   A   It was an eight-member entry team followed by several

2       members used as containment around the house.

3   Q   And for the eight-member entry team, is that standard?

4   A   Yes.  We try to use generally at least eight people,

5       depending on the size of the residences, if we're

6       going to incorporate an attic or a basement, potential

7       two-story we try to get maybe ten.  It all depends on

8       the different factors gathered on recognizance prior

9       to the warrant.

10  Q   Okay.  In this particular case you were the affiant

11      underlying the search warrant, correct?

12  A   Correct.

13  Q   And on this warrant you did not seek authorization to

14      do -- to enter this premises in a no-knock fashion,

15      did you?

16  A   Correct.

17  Q   So this was a knock-and-announced warrant?

18  A   It was a knock-and-announced warrant.

19  Q   And what does that mean?

20  A   That basically the officers that are going to execute

21      the warrant have to go up to the residence, knock,

22      announce their presence, and allow somebody to come to

23      the door in a reasonable amount of time.

24  Q   And what happened upon -- excuse me.  When you

25      approached the door, who was at the door?

1    A    I know Detective David Lopez was assigned the
2         breaching part of the entry.
3    Q    And what does breaching mean?
4    A    Well, two things.  He was going to be the door knocker
5         and announcing the presence of ourselves at the
6         residence.  If we didn't gain any kind of compliance
7         at the door, he also had the tool, like a ram to
8         actually physically breach the doors.
9    Q    And describe for us the basic lay-out of this
10        premises.
11   A    It's a two-story duplex, medium sized, not very big,
12        with a front door, which is on the west side of the
13        residence, and then there's a secondary door on the
14        south side of the residence.
15   Q    And where was your entry to be made through?
16   A    The front door.
17   Q    And you said Detective Lopez was the front detective
18        in position to breach.  Where were you?
19   A    I was positioned -- we're kind of scattered about in
20        front of the door, because everybody's covering
21        different things.  I was covering the upper unit with
22        a long gun.
23   Q    Okay.  How many feet away from Detective Lopez are you
24        approximately?
25   A    Probably within eight feet.

15

Case 2:16-cv-01430-JPS   Filed 06/28/23   Page 15 of 41   Document 125-17
Exhibit 4019 - 015

```
1    Q    Could you see everything he was doing?

2    A    I wasn't watching him.  I was watching the upper

3         residence.

4    Q    Okay.  What happened upon approaching the door?  What

5         did you personally see or hear?

6    A    I personally observed, the entire time prior to

7         breaching, my focus is on that second-story residence

8         to see if anybody comes to the windows, if anybody

9         starts relocating, anybody comes with a gun to the

10        upper unit.

11             That's my position, because I was assigned

12        to one of the long guns, which is AR-15 rifle.  Not

13        everybody in the stack has rifle.  Some have pistols,

14        some have fire extinguishers, some have tazers.

15        Everybody's got a different duty during the entry.

16             So obviously I'm covering on the upper,

17        Detective Lopez starts announcing Milwaukee police

18        while knocking on the door, front door.

19   Q    Knocking on the front door.  Does he knock first, or

20        does he announce first?

21   A    Knock and then announce, knock and then announce.

22   Q    When you say knock and then announce, what is

23        announced?

24   A    Milwaukee police, search warrant.

25   Q    And how is that said?  Is it said in just a
```

16

Exhibit 4019 - 016

```
 1      conversational tone, or how is that relayed?

 2   A  Loud enough where people can hear from both units.

 3   Q  So relatively loud?

 4   A  Relatively loud.

 5   Q  And the knock, is the knock just a slight tapping on

 6      the door, or is it -- how loud is it?

 7   A  It's a forceful (witness demonstrates) forceful knock.

 8             THE COURT:  I would note for the record

 9      that that was a forceful knock.

10             MS. CRIVELLO:  Thank you.

11             THE WITNESS:  Mr. Lopez is a portly,

12      larger person.  He's going to pound a little bit

13      harder than some other people.

14   BY MS. CRIVELLO:

15   Q  So Detective Lopez knocks on the door, and then

16      announces Milwaukee Police Department?

17   A  Correct.

18   Q  Is that wording the standard wording that's utilized

19      by the entry teams?

20   A  Correct.

21   Q  After Detective Lopez pounded, do you recall

22      approximately how many times he pounded?

23   A  I couldn't give you an estimate how many times he

24      knocked, make the same announcement, pause for like a

25      second or two, keep up with the cycle.  In the
```

Case 2:16-cv-01430-JPS   Filed 06/28/23   Page 17 of 41   Document 125-17

Exhibit 4019 - 017

```
 1       meantime I'm also counting approximate seconds in my
 2       head.
 3   Q   So you said that he knocked, and then he announced,
 4       and then what happened?
 5   A   He paused for a second to see if there would be --
 6       anybody would come to the door obviously, then he'd
 7       knock -- we'd get nothing.  He'd knock, announce
 8       again.  This cycle went on for 25 seconds
 9       approximately.
10   Q   How many times did you hear him knock and announce?
11   A   Probably say 15 times.
12   Q   He knocked and announced 15 different times?
13   A   Yes.
14   Q   Then what happened?
15   A   All of a sudden -- I even heard it.  A voice, he later
16       relayed to me that he believed it to be a female
17       voice, but I just heard it as a voice, screamed out,
18       "who is it."
19   Q   Could you tell if it was a male or a female voice?
20   A   I couldn't personally tell.
21   Q   Okay.
22   A   But he was closer to the door to listen, even closer.
23   Q   And when you say "he," do you mean Detective Lopez?
24   A   Detective Lopez.
25   Q   When you hear the voice say, "who is it," what is the
```

18

Exhibit 4019 - 018

```
 1        response?

 2   A    Detective Lopez, again, announced Milwaukee police,

 3        search warrant.

 4   Q    I'm sorry?

 5   A    Search warrant.

 6   Q    And so that would be like the 16th time he's yelled

 7        back, Milwaukee Police Department?

 8   A    Correct, approximately.

 9   Q    And in response to Detective Lopez yelling Milwaukee

10        Police Department, search warrant, is the door opened?

11   A    No.

12   Q    What happens next?

13   A    Detective Lopez informs me that basically he's got a

14        runner, and to me that's somebody that's fleeing from

15        the front door to relocate within the residence.

16   Q    Are you able to determine if this person is running

17        into the lower unit or the upper unit, or where

18        they're running?

19   A    No.  The front door is a complete steel door with no

20        windows.

21   Q    But you do hear -- you hear Detective Lopez advise

22        that it's a runner?

23   A    Correct.

24   Q    And based on your training and experience, what do you

25        fear a runner is going to do?
```

1   A   Relocate in the residence, possibly arm themselves,

2       destroy evidence, alert other confederates of our

3       presence.

4   Q   And based on receiving that information from Detective

5       Lopez, what did you do?

6   A   I again command to breach that door.

7   Q   And did he in fact do so?

8   A   Yes, he did.

9   Q   And what does that mean?

10  A   He used the ram to actually breach that front door and

11      open it.

12  Q   I'm sorry?

13  A   And open it.

14  Q   Upon making entry where did you proceed?

15  A   Directly to the upper unit just past the front

16      entrance way.  There's a stairwell to the right that

17      travels upstairs.

18  Q   Okay.

19              MS. CRIVELLO:  May I approach?

20              THE COURT:  Sure.

21  BY MS. CRIVELLO:

22  Q   Detective, I'm going to show you Exhibit 1, and I'm

23      going to ask you to look at the top picture that

24      there's a purple X next to.  What is that, Exhibit 1?

25  A   The front of the residence with the front door.

20

Exhibit 4019 - 020

```
 1   Q     A photograph of that?

 2   A     Photograph.

 3   Q     Is that how it looked back on the day that you

 4         executed the search warrant?

 5   A     Correct.

 6   Q     And when you have that -- I'm going to show you what's

 7         been marked be as Exhibit 2.  I'm going to ask you to

 8         look at the top photo with the purple X next to it.

 9         Is that in fact that same front door leading from the

10         exterior to the interior, a photograph of that?

11   A     That's correct.

12   Q     And do you see the shading that appears to be a

13         stairwell going to the upper?

14   A     That is it.

15   Q     And is that in fact the stairwell that you indicated

16         you entered and went up?

17   A     That is correct.

18   Q     I'm going to show you Exhibit 3.  I'm going to direct

19         your attention to the bottom photograph with the

20         purple X next to it.  Can you identify what that is?

21   A     Yes.  To the left is a hallway that travels eastbound

22         towards the back side of the house, which would lead

23         to a lower unit, as well as the side south door of the

24         residence, and to the right is the stairwell that

25         travels to the second floor of the residence.
```

21

Exhibit 4019 - 021

```
1   Q    Which is the same stairwell that you proceeded up?

2   A    Correct.

3   Q    Then I'm going to show you Exhibit 4.  Can you

4        identify what that top picture is?

5   A    That is a picture half-way up facing upward toward the

6        actual unit upstairs, which breaks off to the left at

7        the top of that landing that you see within the photo.

8   Q    And then is the bottom photo the actual door into the

9        upper unit?

10  A    Yes, it is.

11  Q    I'd move into evidence Exhibits 1 through 4.

12            THE COURT:  Any objection?

13            MR. SCHOENFELDT:  No.

14            THE COURT:  The Court will receive 1

15       through 4.

16  BY MS. CRIVELLO:

17  Q    And when you went up this stairwell, are all eight of

18       the entry team proceeding up that stairwell?

19  A    That is correct, in single file motion, because of the

20       narrow structure there, with the stairwell and the

21       making the turn up at the top, it's tight.

22  Q    And where are you in this continuum?

23  A    I am, I believe, number five in the stack.  So when

24       Detective Lopez actually travels upstairs and makes a

25       secondary breach upstairs, I'm still kind of around
```

Case 2:16-cv-01430-JPS   Filed 06/28/23   Page 22 of 41   Document 125-17
Exhibit 4019 - 022

```
 1        that corner of the stairwell that's coming down.
 2   Q    Now, when you get to the second landing, do you have
 3        to stop and knock and announce 15 times again at the
 4        second landing?
 5   A    No.  It was my belief we were compromised already
 6        once, and by us -- mind you, as we are travelling up
 7        the stairwell, everybody's yelling police, search
 8        warrant, police, search warrant.  So it's quite
 9        evident that the police presence is there, and we're
10        coming upstairs.
11   Q    And why are you doing that at this point?
12   A    Mainly it's for our safety that people don't think
13        we're robbers or home invaders coming up the stairs.
14   Q    Okay.  And approximately how many times do you yell
15        again Milwaukee police, search warrant, as you're
16        travelling up this stairwell?
17   A    My guess, five, six times myself, and if everybody
18        else is doing it, you can multiply that by
19        approximately eight.  So you get a lot of Milwaukee
20        police, search warrant being yelled, and it's even
21        louder because now you're -- the adrenaline is going,
22        you know you already had a runner, so you're making it
23        even louder.
24   Q    And upon hitting the top -- upon reaching the upper
25        level, what happens at that point?
```

Case 2:16-cv-01430-JPS   Filed 06/28/23   Page 23 of 41   Document 125-17
Exhibit 4019 - 023

1   A    Ultimately, Detective Lopez breached that door, and

2        the team proceeded into the residence.

3   Q    You indicated earlier in your testimony, and correct

4        me if I'm wrong, what my notes reflect is that from

5        the first knock until the time the door was breached

6        it was approximately 25 seconds; is that accurate?

7   A    From the first knock upon arrival?

8   Q    Correct.

9   A    I counted 25 seconds in my head, which took about 15

10       knock and announces.  You got that response, who is

11       it.  He again announced the presence.  You could hear

12       somebody running.  I then gave them an order to breach

13       that door.

14               Now, mind you, it probably takes another

15       three to four, maybe three to five seconds for him to

16       get that ram ready, get in position, get a good

17       footing and then breach that door.

18               So I'd have to say by the time he actually

19       breached the door, we're probably like 35 seconds in

20       from the initial knock.

21  Q    And then approximately how much time elapses from the

22       time the front door is breached until you travel to

23       the second landing and breach the second door

24       approximately?

25  A    Five to ten seconds.  Because we have to get up the

```
1      stairs.  He's got to set up again and breach.

2   Q   And when the front door was breached, were you able to

3      lay eyes on who this runner was?

4   A   No.

5   Q   So at the point you make entry into this common

6      hallway, do you know where this runner has gone?

7   A   No.

8   Q   Is it possible the runner could have gone into the

9      lower?

10  A   He could have went into the lower, he could have went

11     to the basement.

12  Q   Is it also possible the runner could have gone into

13     the upper?

14  A   Correct, yes.

15  Q   But you just did not know at the time the front door

16     was breached?

17  A   Correct.

18  Q   I have nothing further.

19              THE COURT:  All right.  Counsel.

20                  CROSS-EXAMINATION

21  BY MR. SCHOENFELDT:

22  Q   I'll just pick up where you left off.  So you have no

23     idea who that runner was?

24  A   No.

25  Q   And no idea where that person went?
```

Case 2:16-cv-01430-JPS  Filed 06/28/23  Page 25 of 41  Document 125-17
Exhibit 4019 - 025

```
 1   A    Correct.

 2   Q    Don't even know if it was a girl or if it was a boy,

 3        man or woman?

 4   A    Never observed the person.

 5   Q    No idea.  So it took you, from the first pounding on

 6        the door to the breaching of the door, that was 25

 7        seconds, right, approximately?

 8   A    Excuse me, one more time?

 9   Q    Was that 25 seconds -- I don't know if I have your

10        testimony correct -- was it from the first time that

11        you knocked on the door to the breaching of the door,

12        that was 25 seconds?

13   A    That is not correct.  After 25 seconds Detective Lopez

14        got a response from somebody on the other side of the

15        door, asked, who is it.  He advised another

16        announcement, Milwaukee police, search warrant.

17        That's when he heard somebody running.

18                  So I'm guessing between that time frame

19        and the actual breach with him setting up is

20        approximately 35 seconds.

21   Q    And you said that once you breached that door, it

22        takes you about five to ten seconds to get up the

23        stairs?

24   A    I'm guessing roughly.

25   Q    You guys are running, right?
```

Exhibit 4019 - 026

```
 1   A    Yeah, we're moving now.

 2   Q    Your adrenaline -- you said your adrenaline is

 3        flowing?

 4   A    Correct.

 5   Q    So you're sprinting up that stairwell, correct?

 6   A    Safely.

 7   Q    Yeah.  So then when you get up to that door, you don't

 8        hesitate at that point except to get the ram rod out,

 9        and just blast that door through; is that correct?

10   A    We're going to breach that door.

11   Q    Yeah.  You didn't hesitate one second at that point.

12        You made your mind -- you guys had made up your mind

13        that once you got up that stairwell, you're going in,

14        right?

15   A    Yeah.  We're committed at that point.

16   Q    So basically as soon as you got up there, it was

17        instantaneous that door was breached?

18   A    Yes.

19   Q    Okay.  And when you did breach the door, you found a

20        bunch of people in there, correct?

21   A    Two kids on the couch, two kids in another bedroom,

22        and Mr. Carter, Ms. Atkins.

23   Q    And they were what, laying on the couch?

24   A    The kids?

25   Q    I'm sorry.  Yeah.
```

27

```
 1   A      Two kids were on the couch sleeping.

 2   Q      Okay.  They were sleeping.  All right.  And there was

 3          a woman that was what, she -- was she under the covers

 4          or was she --

 5   A      No, no, no.

 6                 MS. CRIVELLO:  I'm going to object to the

 7          relevance of this.

 8                 THE COURT:  Overruled.

 9                 THE WITNESS:  She actually opened up the

10          door to the bedroom, the northwest bedroom.

11   BY MR. SCHOENFELDT:

12   Q      When did she do that?

13   A      When the officers were moving through the house.

14   Q      I'm talking about when you first breached the door,

15          the first thing that you saw when you walked in that

16          door, came to that door.

17   A      The first thing we observed were two kids sleeping on

18          the couch and a closed door to the northwest bedroom.

19   Q      I see.  And in that bedroom you found -- bedroom you

20          found Mr. Carter and this woman, is that what you

21          said?

22   A      Correct.

23   Q      Did you -- strike that.  And it's been established

24          that you did not obtain a no-knock search warrant,

25          correct?
```

```
 1   A    That is correct.

 2   Q    And you recognize the fact that this was a duplex,

 3        right?

 4   A    Correct.

 5   Q    And you did not bother going -- once you breached the

 6        front door, you did not bother breaching the lower

 7        level door, correct?

 8   A    We did not breach the lower level.

 9   Q    So in other words, you assumed that whatever that

10        woman, whoever that person was, that person came from

11        the second floor, correct?

12   A    A person could have came from anywhere within the

13        residence.

14   Q    Well, then why, I guess, wouldn't you breach the lower

15        level door?

16   A    We didn't see anybody run into the lower.

17   Q    You didn't see anybody going into the upper level, did

18        you?

19   A    No, but we already breached the lower door, and we

20        were going to go through that upper door.

21   Q    You made that determination, that you were going to

22        just go into that second door regardless, correct?

23   A    Yes, even if we didn't have a runner, approximately 30

24        seconds in count, we will compromise the door --

25   Q    I'm asking for a yes or no answer on that.
```

29

```
 1   A    What was your question again then?

 2   Q    I guess you can read that back.

 3              (The above question was read back.)

 4              THE WITNESS:  Yeah, after the first breach

 5        to the lower front door.

 6              MR. SCHOENFELDT:  That's all I have.

 7              THE COURT:  All right.  Ms. Crivello.

 8                      REDIRECT EXAMINATION

 9   BY MS. CRIVELLO:

10   Q    Your search warrant, was it for the whole premises?

11   A    No.

12   Q    Where was it for?

13   A    Just the upper unit where Mr. Carter resided.

14   Q    And why was it that when you breached the front door,

15        you were going to go into the upper?

16   A    Because we had a search warrant for the upper

17        residence.

18   Q    I have nothing further.

19                      RECROSS-EXAMINATION

20   BY MR. SCHOENFELDT:

21   Q    But that search warrant called for a knock search,

22        correct, not a no-knock search?

23   A    Correct.

24   Q    Nothing further.

25              MS. CRIVELLO:  I have nothing further.
```

Exhibit 4019 - 030

```
 1                    THE COURT:  Thank you for your testimony.
 2       You can step down.
 3                    MS. CRIVELLO:  I'm going to rest subject
 4       to rebuttal.
 5                    THE COURT:  All right.  Mr. Schoenfeldt.
 6                    MR. SCHOENFELDT:  I think everything's
 7       pretty well outlined in my brief, Your Honor.  You've
 8       already gone through the one issue, which was the
 9       second issue that I had in my brief.
10                    The first issue, it's clear that they did
11       not have a search warrant that was allowed to do it
12       with a no-knock search; they were required to --
13                    THE COURT:  Let me just ask you, because
14       there was testimony that he knocked.  Is your argument
15       that they didn't knock on the upper door, is that what
16       you're saying?
17                    MR. SCHOENFELDT:  That's what I'm arguing,
18       Your Honor.
19                    THE COURT:  Okay.
20                    MR. SCHOENFELDT:  Because we have no idea
21       who this person was, this phantom person that was
22       behind the door.  So we have no idea where she came
23       from.  She could have come from the lower level.  She
24       could have come from outside.
25                    Simply hearing somebody running in the
```

                                                              31

Exhibit 4019 - 031

```
 1       hallway is not sufficient to alleviate the necessity

 2       of a knock search, it just isn't.

 3                    THE COURT:  All right.  The State's

 4       position.

 5                    MS. CRIVELLO:  Well, there was a knock and

 6       announce.  In fact, there were 15 knocks and

 7       announces, and those occurred outside the premises.

 8       They were done in a fashion loud enough to ensure that

 9       everyone contained in the premises would be able to

10       hear, Milwaukee Police Department, search warrant, and

11       that they were in a position throughout the entire

12       premises to hear the pounding loud enough throughout

13       the entire premises.

14                    It's interesting to note that defense

15       counsel, in his brief, never cited to a single case

16       that says officers are -- officers are mandated to go

17       to the second level or any secondary door and knock a

18       second time.

19                    There is no legislation directly on point

20       as to that.  With a no-knock search warrant, upon

21       encountering a duplex with a common hallway, what are

22       officers required to do?  They're required to knock

23       and announce, and in this case there's complete

24       compliance.

25                    Now, I think the issue turning on whether
```

Case 2:16-cv-01430-JPS   Filed 06/28/23   Page 32 of 41   Document 125-17
Exhibit 4019 - 032

1    or not the law should mandate whether or not they have
2    to knock on the upper or lower doesn't even have to be
3    addressed in this particular case.
4              Because in this particular case exigencies
5    arose, and what was the exigency?  Well, in response
6    to 15 different knocks and announce, finally a voice
7    yells, who is it, and in response footsteps are heard
8    tearing away.
9              In response to that, ten seconds later the
10   door is breached and officers make entry.  Now,
11   Detective Kuspa was asked, what was the concern.
12   Well, the concern is exactly what exigencies are.
13             The concern is that person is either
14   arming themselves against law enforcement, that that
15   person is going and destroying evidence; that that
16   person is alerting the drug trafficker or police
17   presence, and that person will at this point flee the
18   premises or will as well destroy evidence.
19             Based on these observations exigency
20   demanded in this particular case that law enforcement
21   proceed up the stairs in an expedited fashion and make
22   entry into that upper premises in compliance with
23   knock-and-announce rules set forth.
24             So in this case I don't see any deviation
25   from the rule whatsoever, and I respectfully request

Exhibit 4019 - 033

```
 1        The Court to deny the defense motion.

 2                 MR. SCHOENFELDT:  Your Honor, that's a

 3        great argument if we can assume a lot of things.

 4        That's all based on assumptions.  First of all, we're

 5        assuming that the person up in the upper duplex heard

 6        these officers knock on the door.

 7                 It's a steel door.  That was -- that's

 8        been stated.  It doesn't have a window on it, so it's

 9        a very sturdy door.  We're going to assume that that

10        person upstairs heard that.

11                 So there's an exigency that's based on an

12        assumption that this person that was running ran

13        upstairs.  That's an assumption.  There's no exigency

14        created except by the officers here.  That's the

15        exigency that's created.

16                 We don't know who this person was.  We

17        don't know where that person went to.  If I had

18        something in the affidavit, we had something in the

19        police reports that said, yes, we heard some walking,

20        we heard some running upstairs, fine, that's great.

21                 That creates an exigency.  It doesn't

22        create an exigency by hearing somebody run away.  For

23        all we know that person ran out the back door.  That

24        person might have been there as a friend.

25                 We don't know.  We're making all kinds of
```

34

Exhibit 4019 - 034

1    assumptions that that person has some connection to

2    that upper level duplex, and we're assuming that they

3    heard, that these people were knocking as hard as they

4    could.  We can't assume that.

5            There's no testimony that these people

6    that were up in the upper duplex heard them knocking

7    at a door, for crying out loud.  If they were knocking

8    that hard, and if there was that much dishevelment

9    going on upstairs, you wouldn't find two kids sleeping

10    on the couch.

11            You'd find those kids -- we're going to

12    assume now -- if you're going to assume that, we're

13    going to assume another part of this.  We're going to

14    assume that those kids are going to be taken into the

15    bedroom, that they're going to be woken up, that

16    they're going to be screaming, they're going to be

17    crying, because all this stuff is going on, but they

18    found them sleeping on the couch, sleeping.  It

19    doesn't make sense.

20            So I don't believe that the search is

21    proper.  It can' be.  What does it take to knock on a

22    door?  Say Milwaukee police are here.  Knock on the

23    (making sound) -- knock on the door.  They don't want

24    to answer within five seconds -- and some of these

25    cases are based -- they allow for three seconds.

35

Exhibit 4019 - 035

```
 1                    They bust the door down after three

 2        seconds.  What does it take to do that?  At least they

 3        fulfill the requirements of the search warrant.  This

 4        time they did not fulfill the requirements of the

 5        search warrant.  So they failed in their search.

 6                    THE COURT:  All right.  The Court did hear

 7        testimony from Detective Kuspa indicating he's been

 8        with MPD for about 25 years, with HIDTA since 2010.

 9        He did identify the defendant.

10                    He was present at the time the entry team

11        did make its entrance.  He testified there were about

12        eight people there, that Detective Lopez announced

13        Milwaukee police while knocking on the door

14        forcefully.

15                    He testified that Officer Lopez indicated

16        that there was a runner, that someone had also

17        indicated, who is it.  This is a duplex, and so it's a

18        bit different in that there's not just one entrance to

19        the home, it's an entrance on a ground level

20        apparently to two separate residences, one being on

21        the ground level, one being upstairs.

22                    The subject of this warrant was the

23        upstairs apartment or level of the duplex.  He

24        testified that approximately 35 seconds after the

25        first time the door was knocked on, the door was
```

                                                                36

Exhibit 4019 - 036

1    breached at that point in time.  It would be the lower
2    level door on the outside of the home.

3            He testified then about five to ten
4    seconds after that door was breached the second door
5    on the upper level was breached.  He testified that
6    the officers were concerned because they didn't know
7    where the runner went.

8            He testified that upon entering, he first
9    observed two children on the couch and that a woman
10   opened up the door to the bedroom, and that was the
11   location he found the woman and the defendant.

12           He testified that when the observation was
13   made, that somebody ran down and somebody ran out.
14   They didn't know exactly where that person went.  He
15   testified the search warrant itself was only for the
16   upper unit.

17           All right.  Based on that The Court will
18   find as follows:  This was a knock-and-search warrant.
19   There was then, therefore, a knock-and-announce
20   requirement.

21           The Court will find that an exigency did
22   arise, in that the officers heard somebody come to the
23   door, asked who is it, and then ran away.

24           The issue relating to the exigency isn't
25   as to the people that are in the house, it's the

37

```
 1    officers.  Do they believe that something has now

 2    arisen to a level where they have to make entrance

 3    immediately.

 4              I would have to agree with the State, in

 5    that there are major concerns when you're attempting

 6    to enter what you belive is a house that contains

 7    drugs and potentially guns, that there is the

 8    potential that the people within the household will

 9    arm themselves, that evidence will be destroyed.

10              And I would agree with counsel at that

11    point though, we don't know.  So the question is, is

12    whether the fact that there's a second door to the

13    upper level, and that's then breached without any

14    knocking or without anything happening.

15              At that point in time The Court will find

16    that because that exigency occurred at that lower

17    level, the officers could then run up the stairs and

18    make entrance to the second door without knocking and

19    announcing.

20              I agree with counsel, we don't have any

21    laws at this point in time that indicate differently,

22    and if the legislature didn't want to pass something,

23    or we would have had case law to indicate a difference

24    in that type of a home versus just a single-family

25    residence, I would certainly have taken notice of
```

Exhibit 4019 - 038

```
 1        that, but I don't have that.

 2                  I'll find the officers did act

 3        appropriately under these circumstances, and therefore

 4        The Court will deny the defense motion.  Counsel, how

 5        would you like the matter calendared?

 6                  MR. SCHOENFELDT:  At this point I guess

 7        we're going to schedule it for trial and a final

 8        pretrial.

 9                  THE COURT:  All right.

10                  MS. CRIVELLO:  The State is hereby

11        revoking its offer at this time.

12                  MR. SCHOENFELDT:  I would ask that the

13        State hold it until the final pretrial, just doing

14        that to move this case along.

15                  THE COURT:  Any objection?

16                  MR. SCHOENFELDT:  If that's possible.

17                  MS. CRIVELLO:  I'm sorry, Judge?

18                  THE COURT:  Any objection to holding the

19        offer open until the final pretrial date?

20                  MS. CRIVELLO:  I'll hold it open until

21        five days before the final pretrial.

22                  THE COURT:  All right.

23                  MS. CRIVELLO:  That way you could do --

24                  MR. SCHOENFELDT:  And he's requesting a

25        speedy trial.
```

Exhibit 4019 - 039

```
 1                THE COURT:  Sure.  The Court will note
 2       that the defendant's -- the defendant has requested a
 3       speedy trial in this matter.
 4                THE CLERK:  Next court date, September
 5       23rd at 8:30 for final pretrial, and October 10th at
 6       8:30 for -- I'm sorry, October 17th at 8:30 for jury
 7       trial.  The speedy runs on November 7th.
 8                MR. SCHOENFELDT:  Once again, the 23rd is
 9       the final pretrial, right?
10                MS. CRIVELLO:  Correct, at 8:30.
11                MR. SCHOENFELDT:  Thank you.
12                THE COURT:  Thank you, everybody.
13                          *  *  *
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                      CERTIFICATE

 2

 3   STATE OF WISCONSIN      }
                             }
 4   COUNTY OF MILWAUKEE     }

 5

 6           I, Lisa A. Weninger, hereby certify that I am an

 7   Official Court Reporter for Circuit Court, Milwaukee County,

 8   Wisconsin.

 9           I further certify that I reported the foregoing

10   proceedings, and that the transcript thereof was prepared by

11   me via computer-aided transcription.

12

13           Dated this 27th day of November 2017.

14

15

16
             Electronically signed by Lisa A. Weninger
17           Lisa A. Weninger, Official Reporter
             Circuit Court, BR 22
18           901 North 9th Street
             Milwaukee, WI 53233-1425
19           (414) 278-4506

20

21

22

23

24

25
```

41

Exhibit 4019 - 041